USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/31/2026___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APICA SELLERS REPRESENTATIVE, LLC, et al.,

                            Plaintiffs,

            -against-

ABBOTT LABORATORIES,

                            Defendant.

23-CV-01034 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiffs Apica Sellers Representative, LLC ("ASR"), Seroba Life Sciences Fund II Limited Partnership ("Seroba"), and TriVentures II Fund L.P. ("TriVentures") (collectively, "Plaintiffs") bring this action against Defendant Abbott Laboratories ("Defendant") for breach of contract. The case stems from an equity purchase agreement (the "Agreement") governing the 2014 sale of Apica Cardiovascular Limited ("Apica") to Defendant's predecessor-in-interest. Plaintiffs (in the shoes of the sellers) allege that Defendant (in the shoes of the buyer) has failed to fulfill its post-sale obligations under the Agreement. ASR initiated this action as the sole plaintiff, purporting to represent the interests of former Apica shareholders in its capacity as the designated "Sellers' Representative" under the Agreement, as well as the independent interests of the Sellers' Representative under the Agreement. Seroba and TriVentures are former Apica shareholders who later joined as additional plaintiffs.

Before the Court are two motions by Defendant: (1) a motion for summary judgment on ASR's lack of standing; and (2) a motion to exclude ASR's proffered experts, Dr. Nader Moazami and Tod Tumey. For the reasons that follow, both motions are DENIED.

1

## BACKGROUND

I.    **RELEVANT FACTS**[1]

This case follows a chain of business acquisitions in the medical devices industry. Relevant here is a type of mechanical circulatory support ("MCS") device called a left ventricular assist device ("LVAD"). J56.1 ¶ 2. An LVAD is a surgically implanted mechanical heart pump that helps the left ventricle pump blood to the rest of the body in patients with advanced heart failure. *Id.* ¶ 3. Apica developed an LVAD connector system to facilitate less invasive surgical implantation. *Id.* ¶ 8. On June 2, 2014, an MCS device company named Thoratec Switzerland GmbH ("Thoratec") acquired Apica. *Id.* ¶¶ 6, 9. In October 2015, St. Jude Medical acquired Thoratec through the acquisition of Thoratec's parent, Thoratec Corporation. *Id.* ¶ 5. Finally, in January 2017, Defendant acquired St. Jude Medical, thus assuming the rights and obligations of Thoratec. *Id.* ¶¶ 4–6; MSJ at 3.

### A. The Agreement

The Agreement governs the sale of Apica to Thoratec (the "Acquisition"). For purposes of the pending motions, the relevant portions of the Agreement are those that identify the Apica-related entities that retained certain rights in connection with Thoratec's post-Acquisition obligations.

---

[1] The following facts are taken from the parties' Joint Statement of Undisputed Facts, Dkt. No. 132 ("J56.1") and from the parties' declarations and exhibits. This Opinion cites Defendant's brief in support of its motion for summary judgment as "MSJ," Defendant's brief in support of its motion to exclude experts as "Exp. Br.," Plaintiffs' opposition to summary judgment as "Opp.," Plaintiffs' opposition to the expert motion as "Exp. Opp.," Defendant's reply brief on summary judgment as "MSJ Rep.," and Defendant's reply brief on experts as "Exp. Reply."

### 1.    The Sellers and the Sellers' Representative

The first page of the Agreement states that it "is entered into by and among" (1) Thoratec; (2) Apica; (3) the "Sellers"; (4) Seroba[2] "as the Sellers' Representative;" and (5) Thoratec Corporation as the guarantor.  J56.1 ¶ 10; Dkt. No. 165-1 at 1.  Schedule I of the Agreement identifies the Sellers as Seroba, TriVentures, and eight other Apica shareholders.  *See* Dkt. No. 165-1 at 214.  Schedule I reflects that Seroba owned a plurality of Apica shares and that Seroba and TriVentures together owned a majority.  *See id.*

Section 11.02 of the Agreement designates Seroba as the Sellers' Representative and defines its role, providing:

> Each Seller irrevocably constitutes and appoints Seroba Kernel Life Sciences Limited (the "Sellers' Representative") as such Seller's true and lawful agent, proxy and attorney-in-fact and agent and authorizes the Sellers' Representative acting for such Seller and in such Seller's name, place and stead, in any and all capacities to do and perform every act and thing required or permitted to be done by such Seller or the Sellers' Representative hereunder or otherwise in connection with the agreements and transactions contemplated by this Agreement, as fully to all intents and purposes as such Person might or could do in person . . . .

*Id.* at 69.  Section 11.02(c) allows for the replacement of Seroba as the Sellers' Representative, providing:

> Upon the death, disability or incapacity of the Sellers' Representative or in the event that the Sellers' Representative resigns for any reason, a majority of Sellers, in accordance with their respective Applicable Post-Closing Consideration Percentages, shall appoint a replacement capable of carrying out the duties and performing the obligations of the Sellers' Representative hereunder within 30 calendar days.  Any substituted representative shall be deemed the Sellers' Representative for all purposes of this Agreement and the other Ancillary Agreements.

---

[2] There are two Seroba entities.  Seroba Kernel Life Sciences Limited was a Seller and the original Sellers' Representative.  It was the general partner of Seroba Life Sciences Fund II Limited Partnership, which is a plaintiff in this action.  J56.1 ¶ 22.  The present motions do not depend on the distinction between the two entities.  For convenience, the Court refers to both Seroba entities, individually and jointly, as "Seroba."

*Id.* at 70. Although the Sellers' Representative "entered into" and executed the Agreement, the Agreement's definition of "Parties" lists only Apica, the Sellers, and Thoratec. *See id.* at 1.

### 2.    Thoratec's Obligations

The Agreement assigns Thoratec certain obligations vis-à-vis the Sellers and the Sellers' Representative. Two are relevant here: (1) the "Milestone Payments" and (2) the "Information Obligations." Both obligations concern Thoratec's potential future use of Apica's LVAD connector system (referred to in the Agreement as the "MCS Surgical Implantation System" and referred to in this opinion as the "System"). Dkt. No. 165-1 at 16. The Agreement contemplates that Thoratec would further develop the System using Apica's intellectual property, which included proprietary technology related to a component called the "Product Coil." *Id.*

### i.    The Milestone Payments

If the System reached specified milestones for further development and commercialization after the Acquisition (*i.e.,* if the System turned out to be a success), the Agreement required Thoratec to make certain bonus payments to the Sellers. The Agreement defines four "Milestone Events" that each correspond to a prescribed Milestone Payment. *Id.* at 18. The Milestone Events are: (1) "First achievement of MCS First-in-Man"; (2) "First achievement of MCS Surgical Implantation System CE Mark Approval"; (3) "The 500th Sale . . . of the MCS Surgical Implanation System"; and (4) "First Achievement of MCS Surgical Implantation System PMA Approval." *Id.* Contingent on the realization of the Milestone Events, the Sellers may receive up to $40 million, plus $0.001 per qualifying sale of the System. J56.1 ¶ 11.

The Agreement provides that the "Right of the Sellers to receive a Milestone Payment . . . shall not be assignable or otherwise transferable by any Seller, except by operation

4

of law" and that "[a]ny attempted transfer of the right to a Milestone Payment by any Seller . . . shall be null and void." Dkt. No. 165-1 at 18.

### ii.     The Information Obligations

The Agreement requires Thoratec to "provide to the Sellers' Representative Bi-Annual written reports indicating the number of Sales of the MCS Surgical Implantation System" (the "Sales Reports"). *Id.*; J56.1 ¶ 20. Starting after the first sale of the System, Thoratec must furnish the Sales Reports "within 60 calendar days of the end of each July 31st and December 31st." Dkt. No. 165-1 at 18. The Agreement further provides that "the Sellers' Representative shall have the right to retain and cause an independent, certified public accountant reasonably acceptable to [Thoratec] to conduct an audit of relevant records of [Thoratec] in order to confirm the total number of Sales." *Id.* at 19. The Sellers' Representative may share the Sales Reports with the Sellers, "provided that the Sellers' Representative may use such information solely to enforce its rights under this Agreement." *Id.* at 18–19.

### B. ASR

ASR is not referenced in the Agreement. J56.1 ¶ 25. Indeed, ASR did not exist when the Agreement was executed. It was formed as a limited liability company on December 5, 2022. *Id.* ¶ 23. That same day, ASR, Seroba, and TriVentures executed an agreement entitled "Resignation and Appointment of Sellers' Representative," which provided for the resignation of Seroba as the Sellers' Representative and the appointment of ASR in its place, pursuant to Section 11.02(c) of the Agreement. *Id.* ¶ 24; Dkt. No. 165-2; Opp. at 8–9.

## II.     PROCEDURAL HISTORY

ASR filed a complaint against Defendant in February 2023, which it amended twice in June 2023. ASR alleges that Defendant successfully commercialized an MCS surgical implantation system called the HeartMate 3, which triggered obligations under the Agreement

because the HeartMate 3 utilizes Apica's Product Coil technology. *See* Dkt. No. 45 ¶¶ 1–2. According to ASR, Defendant breached its obligations by failing to pay the required Milestone Payments and by failing to provide the required bi-annual Sales Reports. *Id.* The Second Amended Complaint asserted claims for breach of contract, declaratory relief, unjust enrichment, and quantum meruit. *Id.* ¶¶ 45–80. On October 26, 2023, ASR and Defendant stipulated to the dismissal of the unjust enrichment and quantum meruit claims. *See* Dkt. No. 55. The litigation proceeded through a contentious discovery phase under the supervision of Magistrate Judge Ona T. Wang. Fact and expert discovery closed on February 6, 2025, and May 28, 2025, respectively. *See* Dkt. No. 100.

On July 9, 2025, Defendant moved to exclude portions of the reports and testimony of ASR's two rebuttal experts. Dkt. No. 113. On August 1, 2025, Defendant moved for summary judgment on lack of standing, arguing that ASR lacks Article III standing to assert the breach-of-contract claim on behalf of the Sellers. Dkt. No. 129. On August 22, 2025, ASR cross-moved for joinder of Seroba and TriVentures as plaintiffs. Dkt. No. 143. Judge Wang granted the cross-motion on November 25, 2025, construing it as a motion to amend. Dkt. No. 163. ASR, newly joined by Seroba and TriVentures, filed the Third Amended Complaint on December 5, 2025. Dkt. No. 165. Defendant thereafter requested that the Court treat the pending motion for summary judgment as if directed to the newly filed Third Amended Complaint. Dkt. No. 168.

## DISCUSSION

### I.    THE SUMMARY JUDGMENT MOTION

Defendant moves for summary judgment on ASR's lack of constitutional standing. It argues that ASR is merely the agent of the Sellers, and since it has no rights of its own under the Agreement, it "has not suffered any redressable, traceable, injury-in-fact." MSJ at 1. Further,

6

because ASR initiated this action as a single plaintiff with no standing, Defendant contends that the Court's jurisdiction over the case was defective from the outset, and the case must be dismissed notwithstanding the subsequent joinder of Seroba and TriVentures. *Id.* The Court agrees that ASR lacks standing to sue on behalf of the Sellers in its capacity as their representative or agent. Nevertheless, ASR has sufficiently established standing to sue on its own behalf as a signatory to the Agreement and as a beneficiary of the Information Obligations. The Court therefore has had jurisdiction over at least a portion of this case since its inception, including jurisdiction to permit ASR to amend its complaint to add Seroba and TriVentures as plaintiffs.

### A.  Legal Standards

#### 1.    Summary Judgment

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[3] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some

---

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

###### 2.    Article III Standing

Article III of the Constitution limits federal court jurisdiction to "Cases and Controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). "That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). Standing consists of three elements: "(1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Id.* at 273–74 (quoting *Lujan*, 504 U.S. at 560–61). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Where a plaintiff lacks standing, a court has no subject matter jurisdiction to hear its claims. *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005). Accordingly, "the standing issue may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)).

The procedural posture of the case determines the applicable burden, as standing must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "Therefore, a party is entitled to summary judgment as to standing only if it establishes that, viewing the evidence and drawing reasonable inferences in the light most favorable to the non-moving party, there are no genuine disputes of material fact regarding whether a plaintiff has standing." *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 542 F. Supp. 3d 232, 238 (S.D.N.Y. 2021) (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999)). "To defend against summary judgment for lack of standing, a plaintiff 'must set forth by affidavit or other evidence specific facts' supporting standing." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013) (quoting *Lujan*, 504 U.S. at 561).

### B. ASR Has Established Standing

In general, a plaintiff has standing to bring a breach of contract claim if it is a party to the contract at issue, an intended third-party beneficiary of the agreement, or an assignee of the claim. *See Rynasko v. New York Univ.*, 63 F.4th 186, 193–94 (2d Cir. 2023). Defendant contends that ASR is none of the above. It focuses largely on the relationship between the Sellers and the Sellers' Representative, arguing that the Sellers never assigned their claims and that ASR's authority is at best equivalent to a power of attorney that does not confer standing to assert claims on behalf of the Sellers. But Defendant fails to demonstrate that ASR, as the Sellers' Representative, is neither a party to the Agreement nor an intended third-party beneficiary, either of which would confer standing to bring a claim for breach of contract.

#### 1.    ASR is a Party to the Agreement

ASR has sufficiently established at this stage that it is a party to the Agreement. The first sentence of the Agreement explicitly states that Seroba, in its capacity as the Sellers'

Representative, "entered into" the Agreement. *See* Dkt. No. 165-1 at 1. Seroba also separately executed the Agreement in its capacity as the Sellers' Representative, in addition to signing as a Seller. *See id* at 96, 214. Generally, "the term 'party', in the context of a contract, means those with whom the 'contract is actually made or <u>entered into</u>.'" *Tomlinson v. Bd. of Educ. of Lakeland Cent. Sch. Dist. of Shrub Oak*, 636 N.Y.S.2d 855, 856 (N.Y. App. Div. 1996) (emphasis added); *see also Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 218 (S.D.N.Y. 2019) ("In common usage, the 'parties' to an agreement are those who 'enter into' the agreement."). The parties who enter into a contract are generally those who execute it. *See Brown v. Caldarella*, No. 08-CV-00857 (DLC), 2008 WL 857983, at *3 (S.D.N.Y. Mar. 31, 2008) ("[A] signatory is any 'party that signs a document . . . and thereby becomes a party to an agreement.'" (quoting *Black's Law Dictionary* (8th ed. 2004)). The Sellers' Representative satisfies both of these indicia of party status.

Additionally, the Agreement provides benefits to the Sellers' Representative pursuant to the Information Obligations, and imposes obligations on the Sellers' Representative to carry out certain duties on behalf of the Sellers. Where an agreement provides specific benefits to a signatory and explicitly states that the signatory has entered into the agreement—even if only "for a limited purpose"— the parties reveal their intent to include the signatory as party to the contract. *See Ogden Power Dev.-Cayman, Inc. v. PMR Co.*, No. 14-CV-8169 (PKC), 2015 WL 2414581, at *9 (S.D.N.Y. May 21, 2015). Taking these facts together, the Court cannot conclude as a matter of law that the Sellers' Representative is not a party to the Agreement.

This conclusion is not altered by the Agreement's provision that only Apica, the Sellers, and Thoratec "are collectively referred to herein as the 'Parties.'" Dkt. No. 165-1 at 1. That provision does not on its face define the outer limit of who can be considered a legal party to the

10

Agreement. Nor does it clearly evince an intention to deprive the Sellers' Representative of party status, especially when read in light of the "entered into" language discussed above and the fact that the Sellers' Representative executed the Agreement as a separate signatory. The provision could reasonably be interpreted merely to create a defined term to refer thereafter to the subset of contracting parties whose rights and obligations are most directly involved in effectuating the Acquisition. Or, alternatively, it simply contradicts the rest of the preamble. At most, then, Defendant has raised an issue of the Agreement's ambiguity, creating a factual dispute that cannot be resolved on summary judgment. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.").

Separately, Defendant relies heavily on *Underdog Trucking, LLC v. Verizon Services Corp.*, No. 09-CV-8918 (DLC), 2010 WL 2900048 (S.D.N.Y. Jul. 20, 2010), to argue that the Sellers' Representative is merely a third-party signatory to the Agreement. *See* Rep. at 3–4. But *Underdog* involved a wholly inapposite question: whether a person has standing to sue in their individual capacity based only on the fact that they executed a contract in their capacity as the officer of a contracting entity. *See Underdog*, 2010 WL 2900048 at *5. The court in *Underdog* easily answered in the negative. *Id.* That holding has no bearing on this case, where the Sellers' Representative is itself the entity that entered into the Agreement.

As a next step, ASR sufficiently establishes at this stage that it assumed the Sellers' Representative's status as a contracting party. Defendant argues that even if the original Sellers' Representative was a party to the Agreement, its successors are not. *See* Rep. at 5. It invokes the provision in Section 11.07 stating that "no Party may assign, delegate, or otherwise transfer

11

any of its rights or obligations under this Agreement without the prior written consent of each other Party hereto." *Id.* Speaking from both sides of its mouth, Defendant here assumes that the defined term "Party" includes the Seller's Representative. Granting it that construction, the full context of Section 11.07 contradicts Defendants' position. Section 11.07 reads: "The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto <u>and their respective successors</u> and assigns; provided that no Party may assign . . . ." Dkt. No. 165-1 at 74 (emphasis added). Section 11.02(c) expressly provides for the appointment of successor Sellers' Representatives and prescribes a specific mechanism for accomplishing that goal. *See id.* at 70. ASR has adduced evidence that it succeeded Seroba as the Sellers' Representative pursuant to that provision. *See* J56.1 ¶ 24; Dkt. No. 165-2; Opp. at 8–9. Thus, no assignment (forbidden or not) was necessary. To the extent Defendant maintains that ASR, Seroba, and TriVentures somehow invalidly appointed ASR as the Sellers' Representative, it has at most raised a dispute of material fact.

2.    **At a Minimum, ASR is an Intended Third-Party Beneficiary**

Even assuming that it is not a party to the Agreement, ASR has established that it is at least an intended third-party beneficiary of the Agreement. "A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit, and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006) (quoting *State of Cal. Pub. Employees. Ret. Sys. v. Shearman & Sterling,* 95 N.Y.2d 427, 434–35 (2000)). "Courts generally have recognized a third party's right to enforce a contract in two situations: when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of

12

the contract that there was an intent to permit enforcement by the third party." *Allen v. Cnty. of Nassau*, No. 22-CV-1572 (HG) (JMW), 2022 WL 4468173, at *3 (E.D.N.Y. Sept. 26, 2022) (quoting *Old Crompond Rd., LLC v. Cnty. Of Westchester*, 162 N.Y.S.3d 71, 808–09 (N.Y. App. Div. 2022).

Section 2.05(d) of the Agreement unequivocally grants the Sellers' Representative the benefit of, *inter alia*, receiving the Sales Reports under the conditions defined by the Information Obligations. *See* Dkt. No. 165-1 at 18–19. Moreover, Section 2.05(d) explicitly characterizes the benefits afforded to the Sellers' Representative as <u>rights</u> that are <u>enforceable</u>. *See id.* at 19 (providing that the Sellers' Representative may use information from the Sales Reports "solely to enforce its rights under this Agreement); *id.* ("[T]he Sellers' Representative shall have the right to retain and cause an independent, certified public accountant reasonably acceptable to Buyer to conduct an audit of relevant records of the Buyer in order to confirm the total number of Sales."). Such an explicit grant of enforceable rights to a named third party evinces the contracting parties' intent to confer a non-incidental benefit to that party. *See MPEG LA, LLC v. Samsung Elecs. Co.*, 86 N.Y.S.3d 4, 8 (App. Div. 2018) ("Plaintiff is an intended third-party beneficiary of the [contract], as that agreement explicitly refers to plaintiff and grants it enforceable rights.").

The fact that the Sellers' Representative is the only party that can enforce the rights under Section 2.05(d) further reinforces its status as a third-party beneficiary. The Sellers themselves are not entitled to the Sales Reports. Rather, "the Sellers' Representative may share such information with the Sellers, its advisors, accountants and attorneys," but only "so long as such parties are subject to a confidentiality obligation with respect to such information and provided that the Sellers' Representative may use such information solely to enforce its rights under this Agreement." Dkt. No. 165-1 at 18–19. Yet the Sales Reports are instrumental for the Sellers'

13

enforcement of their own rights, since the Milestone Payments depend in part on the number of relevant sales. Thus, the Information Obligations are far more than an incidental benefit to Sellers' Representative. They are a key part of the contractual arrangement underlying the Milestone Payments and the duties that the Sellers' Representative owes to the Sellers. To assume that the parties did not intend to grant the Sellers' Representative a right to enforce the Information Obligations would be to assume that the parties intended to hamstring enforcement of the Milestone Payments from the outset (including by the Sellers, who stood to benefit from receipt of any Milestone Payments). The Court declines to do so at this stage.

In response, Defendant points to Section 11.11 of the Agreement, which provides that "no provision of this Agreement is intended to confer any rights, benefits, remedies, obligations, or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns." Dkt. No. 165-1 at 75. That argument is unavailing because such a "boilerplate exclusion of third-party beneficiaries" does not apply where a contract separately and explicitly grants enforceable rights to a specific party. *MPEG LA*, 86 N.Y.S.3d at 8; *see also Diamond Castle Partners IV PRC, L.P. v. IAC/InterActivecorp*, 918 N.Y.S.2d 73, 75 (App. Div. 2011) ("In light of the numerous contract provisions granting plaintiffs enforceable rights, it was reasonable to construe [the third-party beneficiary exclusion clause] to exclude only persons who are neither signatories nor buyer or seller indemnified parties.").

It is true that "courts within this Circuit have consistently held that even where a contract expressly sets forth obligations to specific individuals or categories of individuals, those individuals do not have standing to enforce those obligations by suing as third-party beneficiaries when the contract contains a negating clause." *Wilson v. Dantas*, 746 F.3d 530, 537 (2d Cir. 2014). However, that body of law largely concerns contracts containing only "tangential

14

references" to third-party beneficiaries. *See India.Com, Inc. v. Dalal*, 412 F.3d 315, 322 (2d Cir. 2005). Additionally, the contracts in those cases do not contain provisions directly contradicting the boilerplate exclusionary clause by, for example, providing explicitly enforceable rights to a third party elsewhere in the contract's terms. *See Wilson*, 746 F.3d at 537 ("[I]n light of the negating clause, and lack of any other clause affirmatively granting him rights, Wilson may not rely upon the Limited Partnership Agreement to enforce contractual rights . . . .") (emphasis added); *Freidman v. New York City Taxi & Limousine Comm'n*, 31 N.Y.S.3d 44, 45 (App. Div. 2016) ("Plaintiff lacks standing . . . because the contract expressly and unequivocally negates any intent to permit enforcement by third parties . . . . Unlike the contracts in the cases cited by plaintiff [upholding the rights of third-party beneficiaries to enforce contracts], the [present] contract does not contain conflicting clauses regarding third-party beneficiaries."). Here, there is a clear conflict between Section 2.02(d) and the boilerplate exclusionary clause, and the Court "concludes that, at a minimum, the Agreement is ambiguous relative to whether [ASR] has a right to sue for breach of the Agreement." *Diverse Partners, LP v. AgriBank, FCB*, No. 16-CV-9526 (VEC), 2017 WL 4119649, at *3 (S.D.N.Y. Sept. 14, 2017) (citing *Diamond Castle Partners*, 918 N.Y.S.2d at 75).

ASR has accordingly met its burden to establish, at the very least, standing to sue for breach of the Information Obligations.

**C. There is No Jurisdictional Defect Requiring Dismissal of the Case**

The Court's holding as to standing invalidates Defendant's related argument that the case was founded on an incurable jurisdictional defect. Contrary to Defendant's position, the Court had jurisdiction to permit the joinder of Seroba and TriVentures to cure any potential standing problem, and dismissal of the case is not warranted.

Defendant's argument for dismissal relies on the so-called nullity doctrine, "which says that a case initiated in the name of a plaintiff that lacks standing is an incurable nullity." *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021) (concluding "that neither Article III nor our Court's past precedent requires us to adopt this doctrine"). The Second Circuit has explicitly rejected the nullity doctrine where a complaint "fail[s] to initially name the correct party" but "the real party in interest is willing to join the case and has had standing since the case's inception." *Id.* at 386, 388–89 ("We hold today that Article III is satisfied so long as a party with standing to prosecute the specific claim in question exists at the time the pleading is filed."). Defendant notes that the holding in *Fund Liquidation* allows only for curing defective jurisdictional <u>allegations</u>, not defective jurisdiction <u>itself</u>. *See* MSJ Rep. at 9; *Fund Liquidation*, 991 F.3d at 388–89 ("[I]t is well-understood that a plaintiff may cure defective jurisdictional allegations, unlike defective jurisdiction itself, through amended pleadings."). That argument invokes "[t]he longstanding and clear rule is that 'if jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim.'" *Pressroom Unions-Printers League Income Sec. Fund v. Cont'l Assur. Co.*, 700 F.2d 889, 893 (2d Cir. 1983) (quoting *Pianta v. H.M. Reich Co.*, 77 F.2d 888, 890 (2d Cir. 1935). Defendant further argues that this case involves defective jurisdiction, since "ASR has 'never possessed a claim against' [Defendant]." MSJ Rep. at 9 (quoting *Fund Liquidation*, 991 F.3d at 389–90, n.10).

Defendant does not fully explain why, assuming ASR had no standing, the initial naming of ASR as the plaintiff in this action would constitute a defect in jurisdiction itself rather than a defect in jurisdictional allegations. *See Cortland St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l*, 790 F.3d 411, 422 (2d Cir. 2015) (noting that substitution of a

16

plaintiff is permitted "when a mistake has been made as to the person entitled to bring suit and such substitution will not alter the substance of the action") (emphasis added). Regardless, the Court need not resolve any potential tensions surrounding the continued viability of the nullity doctrine in this Circuit because ASR has always possessed a claim against Defendant. At a minimum, the Court had jurisdiction over ASR's claim for breach of the Information Obligations when this action was filed. A real case or controversy therefore existed from the outset. This case was never a nullity.

The Court, through its referral to Judge Wang, has already permitted ASR to amend its complaint to add as plaintiffs Seroba and TriVentures, whose standing is not in dispute.[4] The only question is whether the Court had jurisdiction to do so. For the reasons set forth above, it clearly did.[5] Accordingly, Defendant's motion for summary judgment on lack of standing is denied.

---

[4] Defendant argues here, and before Judge Wang, that it would be prejudiced by the "11th hour" addition of Seroba and TriVentures. *See* Mot. at 2. Although Defendant catalogs its discovery burdens vis-à-vis other non-party Sellers, it does not specify how those purported burdens apply specifically to Seroba and TriVentures. Moreover, Plaintiffs have an equally compelling argument that Defendant, despite knowing all or nearly all of the facts it relies on for its motion since the early days of this case, deliberately sandbagged them by waiting until after the close of all discovery to file this motion, specifically so that it could oppose any attempt to cure. The Court need not resolve these competing allegations to decide the present motions, but suffice to say that neither side can claim the mantle of injured party.

[5] The Court permitted the amendment pursuant to Rule 15 of the Federal Rules of Civil Procedure, and Defendant principally argues against joinder under the more specific provisions of Rule 17(a)(3). But even Defendant's authorities clearly distinguish cases where the original plaintiff had jurisdiction over at least *some* claims. *See Cortlandt St. Recovery*, 790 F.3d at 422 (noting that an amendment to cure defective standing was proper in a prior case because "the named plaintiff had standing . . . to pursue at least some of its claims against the defendants") (citing in *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 17 (2d Cir. 1997)); *Alix v. McKinsey & Co.*, 739 F. Supp. 3d 172, 186 (S.D.N.Y. 2024) (identifying the relevant question to be "whether a plaintiff may use Rule 17(a)(3) to remedy a standing deficiency when it lacks standing as to *all* of its claims"); *see also Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12-CV-00722 (PAE), 2012 WL 4849146, at *8 (S.D.N.Y. Oct. 12, 2012) ("[W]here courts in this Circuit have used of Rule 17(a)(3) to remedy defects in standing, they have generally done so where the plaintiff clearly had standing on another claim that it brought.").

17

## II.    THE MOTION TO EXCLUDE PLAINTIFFS' EXPERTS

In addition to its motion for summary judgment, Defendant moves to exclude portions of the reports and testimony of Plaintiffs' proposed experts. *See* Dkt. No. 113. Plaintiff did not serve affirmative expert reports but did serve rebuttals to Defendant's affirmative reports. First, Dr. Nader Moazami rebutted the report of Defendant's medical expert, Dr. Scott Silvestry. *See* Dkt. No. 117-4. Those reports address the technological significance of Apica's System and its relation to Defendant's HeartMate 3 product, related to whether the commercialization of the HeartMate 3 triggered the Milestone Payments. *See generally id.*; Dkt. No. 117-1. Second, Tod Tumey rebutted the report of Defendant's patent procedures expert, Nicholas Godici. *See* Dkt. No. 117-2. Those reports address the scope of Apica's intellectual property rights related to the System. *See generally id.*; Dkt. No. 118-2. Defendant argues that both of Plaintiffs' experts improperly offer: (1) rebuttals that exceed the scope of Defendant's opening expert reports; (2) legal interpretations and conclusions about the Agreement; and (3) opinions on matters where they lack expertise. *See* Exp. Br. at 1.

The Court declines to exclude any expert opinions at this stage. The parties acknowledge that this case will proceed to a bench trial. *See* Dkt. No. 44; Exp. Reply at 11. Courts are "especially reluctant to exclude expert testimony in a bench trial." *Salahuddin v. United States*, 564 F. Supp.3d 75, 84–85 (E.D.N.Y. 2021). Where, as here, the Court is the factfinder, "the trial judge is presumed to be able to exclude improper inferences from his or her own decisional analysis." *Browe v. CTC Corp.*, 15 F.4th 175, 207 (2d Cir. 2021). Consequently, "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013). In other words, "there is no need for the Court to gate-keep expert testimony

18

from itself." *Matter of Manhattan by Sail, Inc.*, 436 F. Supp. 3d 803, 810 (S.D.N.Y. 2020) (quoting *Joseph S. v. Hogan*, No. 06-CV-01042 (BMC) (SMG), 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011)). "Under these circumstances, unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to 'take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology.'" *Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 220 (S.D.N.Y. 2019) (quoting *Hogan*, 2011 WL 2848330, at * 3).

Of course, inadmissible evidence must not hold sway even at a bench trial, so Defendant's arguments will require further attention at the appropriate time. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-05075 (LJL), 2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022) ("Although a court has general discretion to hear expert testimony and reserve on a *Daubert* motion until the conclusion of a bench trial, it still must perform a Rule 702 and *Daubert* analysis before it relies upon expert testimony."). For the sake of efficiency, that time is not now, particularly where the challenged evidence is not "wholly irrelevant or so speculative as to have no probative value." *Republic of Turkey*, 425 F. Supp. 3d at 220. "[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence." *Howard Univ. v. Borders*, No. 20-CV-04716 (LJL), 2022 WL 3568477, at *6 (S.D.N.Y. Aug. 17, 2022) (quoting *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009)).

The same is true for questions regarding the proper scope of rebuttal reports. *See Chemimage Corp. v. Johnson & Johnson*, No. 24-CV-2646 (JMF), 2025 WL 1166992, at *1 (S.D.N.Y. Mar. 5, 2025) ("Although rebuttal is not limited to direct contradiction, a rebuttal

19

report is indeed limited to the same subject matter identified by another party. In ruling on the merits, the Court will adhere to these principles and disregard any testimony by Defendants' rebuttal experts that is not proper. Once again, however, it sees no need to resolve the parties' arguments in advance of trial."). The efficiency rationale is especially strong here since Defendant seeks to exclude only select portions of Plaintiffs' expert opinions, and it is unclear whether any of those portions will be elicited at trial by Plaintiffs or relied on by the Court for any disputed issue. If the Court ultimately intends to rely on an expert opinion, it will scrutinize its admissibility. It need not, however, waste time preemptively resolving Defendant's challenges. Additionally, with respect to whether the actual testimony ultimately offered by Plaintiffs' experts at trial are proper rebuttals to whatever expert testimony is offered at trial by Defendant, reserving the issue until during or after trial will provide greater context for addressing the true scope, nature, and purpose of the experts' testimony.

## III.    MOTIONS TO SEAL

Finally, the parties have filed five uncontested letter motions to file under seal certain of their submissions in connection with the pending motions on the grounds that they contain confidential business information. *See* Dkt. Nos. 114, 120, 126, 136, 146.

"The right of public access to judicial documents is protected both by a common law right of public access and by the First Amendment to the United States Constitution." *Ferrand v. Lyonnais*, 106 F. Supp. 3d 452, 454 (S.D.N.Y. 2015). This right, however, is "not absolute." *Mirlis v. Greer*, 952 F.3d 51, 59 (2d Cir. 2020). To determine whether the common law presumption of access attaches to a particular document, courts conduct a three-step analysis. *Id.* The first step in the analysis is to determine whether the document at issue is a judicial document to which the presumption of access attaches. *Id.* Next, the Court assesses "the weight of the

presumption of access to that document," which is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id.* Finally, "the court must identify all of the factors that legitimately counsel against disclosure of the judicial document, and balance those factors against the weight properly accorded the presumption of access." *Id.*

The parties' submissions are judicial documents because they are "relevant to the performance of a judicial function and useful in the judicial process." *Mehta v. DLA Piper LLP*, No. 23-CV-04757 (AT) (RFT), 2026 WL 280463, at *2 (S.D.N.Y. Feb. 3, 2026). However, the Parties have proposed redacting the documents in a way that is narrowly tailored to protect only their highly confidential business information. *See Samsung Elecs. Co. v. Microchip Tech. Inc.*, 748 F. Supp. 3d 257, 261 (S.D.N.Y. 2024) ("[T]he Court finds that the proposed sealing requests are narrowly tailored to prevent unauthorized dissemination of confidential business information, as well as proprietary technical and trade secret information, the protection of which outweighs the public's right of access."). Accordingly, the motions to seal are granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 129) is DENIED. Defendant's motion to exclude Plaintiffs' experts (Dkt. No. 113) is DENIED without prejudice to renew. The parties' several motions to seal (Dkt. Nos. 114, 120, 126, 136, 146) are each GRANTED.

Dated: March 31, 2026
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge

21